**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 25-cr-219-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    **WELTON L. HARRIS, III,**

      Defendant.

---

## ORDER DENYING MOTION TO SUPPRESS EVIDENCE

---

Before the Court is Defendant Welton Harris III's Motion to Suppress Evidence ("Motion"). (ECF No. 23.) The Government filed a response (ECF No. 29), and the Court thereafter granted Harris leave to file a reply (ECF Nos. 30, 31). In accordance with Harris's request (ECF No. 23 at 1, 14), the Court also held an evidentiary hearing ("Hearing") on the Motion on January 22, 2026. (ECF Nos. 30, 37.)

The Motion is now ripe for adjudication. For the reasons set forth below, the Motion is denied.

## I.    BACKGROUND[1]

Shortly after 4:00 a.m. on October 26, 2024, Aurora Police Department ("APD") Officers Riter and Martinez were patrolling in a marked police vehicle when they

---

[1] This Background is derived from the parties' briefs on the Motion, the documents submitted in support thereof, and the documentary and testimonial evidence adduced at the January 22, 2026 evidentiary hearing. All citations to docketed materials are to the page number in the CM/ECF heading, which sometimes differs from a document's internal pagination. In addition, quotations from the evidentiary hearing are taken from the rough draft of the

observed a silver sedan traveling westbound on East Colfax Avenue run several red lights. (ECF No. 29-1 at 1.) The officers activated the police vehicle's lights and sirens to initiate a traffic stop, but the driver of the vehicle did not pull over. (*Id.*) Instead, the silver sedan accelerated and ran additional traffic lights. (*Id.*) The officers decided to discontinue their pursuit of the fleeing vehicle, given the risk police chases generally pose to the safety of the public, the officers, and the suspect, and their concern that continued pursuit "would only increase [the vehicle's] reckless driving behavior." (*Id.*) In his offense report detailing the incident, Officer Riter noted that the conduct of the unknown driver amounted to felony eluding under Colo. Rev. Stat. § 18-9-1165.[2] (*Id.*)

Officer Riter testified at the Hearing that, at the time of the offense, the vehicle was too far away for the officers to make out the license plate number, any identifying characteristics of the driver, or whether there were any other occupants in the vehicle. (Tr. 26.) However, based on his review of images and video footage captured by nearby traffic cameras and license plate readers, he believed the eluding vehicle was a silver 2011 Nissan Altima with "heavily tinted" windows (the "Nissan"). (*Id.*)

---

transcript ("Tr.") prepared by the Court Reporter, which is subject to revision before it is finalized.

[2] Section 18-9-116.5 provides:

> Any person who, while operating a motor vehicle, knowingly eludes or attempts to elude a peace officer also operating a motor vehicle, and who knows or reasonably should know that he or she is being pursued by said peace officer, and who operates his or her vehicle in a reckless manner, commits vehicular eluding.

C.R.S. § 18-9-116.5(1). Under the statute, vehicular eluding is a class 5 felony if it does not result in bodily injury or death to another person. *Id.* at § 18-9-116.5(2).

2

Using the Colorado license plate number detected by the license plate readers, Officer Riter determined the registered owner of the vehicle was a woman, "A.P.", who had a registered address in Commerce City.  (ECF No. 29-1 at 1.)  He requested assistance from the Commerce City Police Department ("CCPD") to check A.P.'s registered address for the Nissan sedan, but CCPD did not find the vehicle there.  (*Id.*)  Officer Riter thereafter placed an Attempt to Locate ("ATL") on the Nissan, requesting that any officer who subsequently located it identify the occupants and hold the vehicle because it was used in the commission of a crime.  (*Id.*)

The case was thereafter assigned to an investigator in the Traffic Investigations Unit of the APD, who attempted to contact A.P. directly by phone on October 30, 2024 and left a voicemail.  (ECF No. 29-1 at 1–3.)  He received a return call from a female caller a few moments later, but she hung up after the investigator identified himself.  (*Id.* at 3.)  The investigator's subsequent efforts to contact A.P. directly by phone were similarly unfruitful.  (*Id.*)

The investigation of the eluding offense remained stagnant until December 19, 2024, when, at around 5:30 p.m., two teams of APD Gang Intervention Unit ("GIU") officers on patrol received an alert that the Nissan was on North Peoria Street near Albrook Drive.  (ECF No. 23-4 at 7.)  The National Crime Information Center ("NCIC") / Colorado Crime Information Center ("CCIC") database reported that the Nissan was a "Vehicle of Interest," with a notation to "STOP, ID OCCUPANTS, TOW VEHICLE, PLACE HOLD AND CONTACT APD OFC RITER."  (*Id.* at 2.)

The APD officers responded to locate the vehicle.  (*Id.* at 7.)  En route, the officers learned that the car was registered to A.P.  (*Id.* at 3.)  Officer Schoolmaster

3

testified at the Hearing, however, that an APD detective had earlier reported that he had seen Harris getting into the Nissan on a prior occasion, (Tr. 61), so the officers believed that Harris also "may be operating the vehicle."  (ECF No. 23-4 at 3.)  Officer Schoolmaster testified that he was familiar with Harris before December 19, 2024, and specifically believed him to be affiliated with a gang, and knew he had a history of possessing weapons, had alluded on his public social media accounts to selling drugs, and had a revoked license.  (Tr. 68–70; ECF No. 23-4 at 9.)

The officers located the Nissan minutes after receiving the alert and followed it. (ECF No. 23-4 at 9.)  They observed the vehicle pull into a strip mall and park directly in front of a liquor store in a marked fire lane.  (*Id.*)  Officer Schoolmaster recognized the driver as Harris when he exited the vehicle and walked into the liquor store.  (*Id.* at 7, 9.) The officers also observed that (Tr. 68.)

The officers decided to approach Harris on foot after he exited the liquor store. (Tr. 69.)  Officer Schoolmaster explained at the Hearing that this was because they believed that he "would likely elude again and cause a danger to other vehicles on the road," so they hoped to "contact the driver in a more safe manner outside the vehicle." (*Id.*)  In accordance with their plan, the officers intercepted Harris when he exited the store and placed him in handcuffs.  (ECF No. 23-4 at 7.)

After Harris was detained, Officer Schoolmaster made the decision to impound the Nissan "[b]ased off the ATL request to tow the vehicle" as evidence related to the felony eluding offense and the vehicle "being parked in the fire lane."  (Tr. 74.)  He testified that he did not make any effort to contact the registered owner to retrieve the vehicle because, as the vehicle was "being held as evidence in . . . the eluding crime," it

4

would not have been permissible for the owner to take the car away. (Tr. 75.) Nor did he ask the owner of the liquor store whether the vehicle could remain parked in the shopping center "[b]ecause it was parked in a fire lane." (*Id.*)

After deciding to tow the vehicle, Officer Schoolmaster promptly commenced an inventory search. At the start, Officer Schoolmaster asked Harris if there was anything valuable in the vehicle that belonged to him. (ECF No. 23-4 at 9–10.) Harris asked him to retrieve his cell phone from the vehicle but indicated that nothing else in the car was his. (*Id.*) After locating the cell phone and placing it on the roof of the vehicle, Officer Schoolmaster continued with the inventory search, beginning on the driver's side of the vehicle and then proceeding to the passenger side. (*Id.* at 10.) When he reached the passenger side of the vehicle, Officer Schoolmaster observed a backpack that "was large and unzipped" on the floorboard. (*Id.*) He looked inside the backpack "and observed what appeared to be a large amount of cocaine and [a] bag of psilocybin mushrooms." (*Id.*) A further search of the backpack yielded "a large amount of small denomination cash bills." (*Id.*)

Officer Schoolmaster testified that, after finding the drugs in the backpack, he believed the officers had probable cause to search the vehicle for additional "paraphernalia consistent with drug distribution, maybe bags, digital scale." (Tr. 87.) He also believed there could be a firearm in the car, as in his experience "individuals involved in that level of drug distribution are armed for their protection to prevent against being robbed by rival drug dealers . . . ." (*Id.*) Officer Schoolmaster alerted the other officers to what he had found and asked one of the officers, Officer Child, to conduct a further search of the driver's side of the vehicle. (*Id.*) Officer Child ultimately "removed

5

a firearm that was concealed under the plastic trim under the driver's seat" that Officer Schoolmaster had not located in his earlier search.  (*Id.*)

Based on the evidence recovered during the officers' search of the Nissan, Harris was arrested and transported to the Aurora Detention Center.  (ECF No. 23-4 at 10.) Harris was initially charged with drug and weapon offenses in Colorado state court. (ECF No. 29 at 5.)  A federal grand jury subsequently returned an indictment charging him with four drug-trafficking and weapons offenses.  (*Id.*)

Harris now moves to suppress "all evidence obtained during and derived from the unlawful impoundment and search of the vehicle in which he was traveling on December 19, 2024," "including the drugs, gun, and all statements made by Mr. Harris following his arrest."  (ECF No. 23 at 1, 14.)

## II.    LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "For a search or seizure to be reasonable, it must ordinarily be supported by a warrant based on probable cause."  *United States v. Chavez,* 985 F.3d 1234, 1240 (10th Cir. 2021).  "The defendant has the burden of showing the Fourth Amendment was implicated, . . . while the government has the burden of proving its warrantless actions were justified."  *United States v. Goebel,* 959 F.3d 1259, 1265 (10th Cir. 2020) (internal citations omitted).

"On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences

the district court draws from that evidence and testimony are entirely within its discretion."  *Id*.

<h2 style="text-align:center">III.    ANALYSIS</h2>

Harris moves to suppress the evidence seized from the Nissan on December 19, 2024 "as the product of an unlawful seizure and search."  (ECF No. 23 at 4.)  The parties do not dispute that the search and seizure of the Nissan implicated the Fourth Amendment and that no warrant was obtained.  (*Id*.; ECF No. 29 at 5.)  Thus, the burden shifts to the Government to establish that an exception to the warrant requirement applies.  *Goebel,* 959 F.3d at 1265.

The Government presents several justifications for the officers' warrantless search and seizure of the Nissan.  To the Court's understanding, its primary line of argument is that (1) the officers were permitted to impound (or seize) the Nissan pursuant to the automobile exception; (2) incidental to that impoundment, the officers were permitted to conduct an inventory search of the Nissan consistent with APD procedures; and (3) once the officers found drugs and cash in the backpack, the inventory search converted into a permissible probable cause search under the automobile exception.  (ECF No. 29 at 6–7, 14–15; *see also* Tr. 16–17.)  The Government also argues, in addition or in the alternative, that the officers were permitted to seize the Nissan as forfeitable contraband under Colo. Rev. Stat. § 16-13-315(1), and/or pursuant to the community-caretaking exception; and further that the automobile exception justified the officers' search of the Nissan from the outset.  (ECF No. 29 at 5–14; Tr. 14–16.)

Ultimately, the Court sees little need to analyze whether the search was a proper inventory search, or whether the community-caretaking exception or Colorado forfeiture statute permitted the seizure of the Nissan, because it finds the last argument dispositive: The officers had probable cause to search the Nissan for evidence related to the October 2024 felony eluding offense from the start. Thus, as analyzed in greater detail below, the search of the Nissan was constitutionally permitted under the automobile exception to the warrant requirement.

Under the automobile exception, "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo,* 500 U.S. 565, 580 (1991). "The rationale for the automobile exception is based on both the inherent mobility of cars (as it is often impracticable to obtain a warrant before a car can be driven away) and the fact that there is a reduced expectation of privacy with motor vehicles." *U.S. v. Mercado,* 307 F.3d 1226, 1228 (10th Cir. 2002). "For probable cause to exist, an officer need only have the specific factual knowledge that justifies a search or arrest, regardless of the officer's actual motivation." *United States v. Huff,* 782 F.3d 1221, 1226 (10th Cir. 2015). "[P]robable cause is not a high bar," but "the government must still present sufficient evidence that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Chavez,* 985 F.3d at 1246.

Under the circumstances here, the Court agrees with the Government that the officers "had probable cause to search the Nissan sedan for evidence of the vehicular eluding offense" and, more specifically, for "evidence of the identity of the driver

8

involved."  (ECF No. 29 at 7.)  As summarized in Section I *infra*, the officers certainly had probable cause to believe that the Nissan was used in commission of the eluding offense in October 2024 based on Officers Riter's observations of the vehicle at the time of the incident, and the information he later gleaned from nearby traffic cameras and license plate readers.  And, there was a fair probability that the Nissan would contain evidence that would assist law enforcement in identifying the likely driver of the vehicle at the time of the offense, including items like "receipts; records regarding ownership, insurance, and maintenance of the vehicle; and personal items that evidence the identity of the primary user of the vehicle."  (*Id.*; *see also* Tr. 42 (Officer Riter testifying that he expected to find "identifiable documents such as work badges, passes, mailing envelopes, insurance registration, anything with demographics inside the vehicle"); *id.* at 73 (Officer Schoolmaster testifying "receipts that are dated the specific day" may be found in the vehicle and corroborated with surveillance footage and that the infotainment systems in "many cars these days" maintain a log of cell phones that have been paired with the vehicle, along with the date and time).)  *See also United States v. Vo,* 2006 WL 2850301, at *10 (D. Kan. Oct. 4, 2006) ("It is common knowledge that documents evidencing ownership and registration of a car are typically kept within the vehicle . . . .").

In addition, the Government persuasively argues that the Nissan itself was evidence of the vehicular eluding offense, inasmuch as it could be photographed for physical characteristics, such as the tinted windows, that matched the fleeing vehicle Officers Riter observed at the time of the offense and in footage of the vehicle captured by traffic cameras.  (ECF No. 29 at 6.)  *Cf. United States v. Vallez,* 733 F. Supp. 3d

1120, 1133 (D.N.M. 2024) (automobile exception permitted search of SUV where "the vehicle itself was evidence . . . of a DWI, speeding, evading, reckless driving, and destruction of property").

Nevertheless, Harris contends that probable cause that a vehicle was used in the commission of a vehicular eluding offense is not sufficiently exigent to support the application of the automobile exception.  (ECF No. 31 at 3.)  Rather, he contends that the automobile exception applies where "police have probable cause that a defendant has committed an offense but lack physical evidence of the crime," such as "drugs or contraband goods," that "itself is mobile and may be moved or destroyed." (*Id.* at 4.)  In Harris's view, that is unlike here, where the officers had already "identified the vehicle and its registered owner," and "there was no risk of loss of that information."  (*Id.*)

To the extent Harris is arguing that the Government must demonstrate exigent circumstances independent of the inherent mobility of the Nissan before the automobile exception can apply, his argument is contrary to law.  "[T]he 'automobile exception' has no separate exigency requirement."  *Maryland v. Dyson,* 527 U.S. 465, 466 (1999); *see also Mercado,* 307 F.3d at 1228 ("The Supreme Court has repeatedly stated that if an automobile is 'readily mobile and probable cause exists to believe it contains contraband,' a further showing of exigent circumstances is unnecessary." (quoting *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996))).

Nor is the automobile exception limited to cases where law enforcement has probable cause that the vehicle contains contraband.  "The exception applies to searches for 'evidence of criminal activity,' . . . and not merely contraband."  *United States v. Salomon-Mendez,* 992 F. Supp. 2d 340, 348 n.4 (S.D.N.Y. 2014).  Consistent

therewith, federal courts have upheld the application of the automobile exception in cases where the officers appear to have been exclusively searching for information that was not necessarily incriminating on its face.  *See, e.g., id.* at 348 (concluding agent had probable cause to search vehicle used in a robbery and attempted robbery for "evidence of the vehicle's ownership, which would link the [vehicle] to the defendant" and "could be used in the prosecution of the defendant"); *United States v. Rumph,* 754 F. Supp. 3d 417, 427–28 (S.D.N.Y. 2024) (finding probable cause to search vehicle connected to armed robbery for evidence of ownership, "which can link the car to a suspect"); *see also United States v. Jenkins,* 984 F.3d 1038, 1044–45 (D.C. Cir. 2021) (suggesting that, even if probable cause had dissipated, given the passage of time, to search vehicle for "inherently incriminating evidence like a murder weapon or illegal drugs" used in connection with the shooting, there was still probable cause to search the vehicle for "[e]ven outwardly innocuous evidence—such as a driver's license or gas receipts—[that] might indicate who operated the [vehicle]").

To be sure, that is not to say that an eluding offense will *always* give rise to probable cause to search the vehicle involved.  For instance, in *United States v. Davis,* the Fourth Circuit concluded officers did not have probable cause to search the defendant's vehicle after he drove off during a traffic stop and was apprehended after a police pursuit.  997 F.3d 191, 201 (4th Cir. 2021).  It reasoned that the defendant's flight "coupled with the cash in his pockets" found incidental to his arrest "may have given the officers an *articulable suspicion* that evidence of a crime could be located in the vehicle, [but] it did not give them *probable cause* to circumvent the Fourth Amendment's warrant requirement and search the vehicle."  *Id.* (emphasis in original); *see also United States*

11

*v. Stevenson,* 2025 WL 3039259, at *3 (D. Md. Oct. 31, 2025) (relying on *Davis* in concluding the fact that defendant "fled from police and was arrested for traffic violations and eluding . . . did not 'tip the scales' from reasonable suspicion to probable cause"). Within this Circuit, the Eastern District of Oklahoma also rejected the "automatic" application of the automobile exception in a case involving a vehicular eluding offense. *United States v. Cole,* 2025 WL 2406538, at *5 (E.D. Okla. June 5, 2025) (reasoning "the right to arrest [Defendant] did not automatically provide the right to search Defendant's vehicle as there was no reason to believe the vehicle would contain evidence of the crime of arrest, *i.e.,* eluding a police officer").

The foregoing authorities are, however, factually distinguishable in one critical regard: the defendants were apprehended for eluding immediately following a police pursuit, so there was no question about the identity of the vehicle involved in the eluding offense, or the identity of its driver.  *See Davis,* 997 F.3d at 191 (where law enforcement first made direct contact with the defendant during a traffic stop and, after he fled, pursued him until he was ultimately arrested); *Stevenson,* 2025 WL 3039259, at *1 (where defendant pulled over his vehicle in response to law enforcement's attempt to initiate a traffic stop, after which he fled on foot until he was ultimately apprehended "several blocks away"); *Cole,* 2025 WL 2406538, at *2 (where the arresting officer "caught up" to the eluding vehicle as the defendant "was exiting it").  Though Officer Riter already identified the license plate number and registered owner he believed to be associated with the eluding silver sedan, Officer Schoolmaster testified that the GIU had received a report from another detective that he had observed Harris—with whom the detective had previous familiarity—exiting a liquor store and getting into the Nissan.  (Tr.

12

61.)  So, while the Court agrees with the foregoing authorities to the extent they support the notion that it is unlikely direct evidence of eluding would be found in a vehicular search, under the circumstances here, law enforcement had sufficient reason to question whether the identity of the registered owner and the offending driver were one and the same, and probable cause to believe that documents inside the vehicle would assist it in identifying the culpable party.

Harris additionally counters that "the two month gap" between the eluding offense and the officers' search of the vehicle "renders the probable cause stale."  (ECF No. 31 at 4.)  But the Court again disagrees.  "[W]hether . . . information is too stale to establish probable cause depends"—not on "the days of the calendar"—but "on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Cantu,* 405 F.3d 1173, 1177 (10th Cir. 2005) (internal citation and quotation marks omitted).  Courts have reasoned that "outwardly innocuous evidence," like "a driver's license or gas receipts," that may indicate who operated a vehicle used in the commission of an offense is "less likely to be discarded within a matter of weeks." *Jenkins,* 984 F.3d at 1044 (finding "probable cause sufficiently fresh to support seizure of the [vehicle]" 52 days after shooting); *Salomon-Mendez,* 992 F. Supp. 2d at 348 (concluding "the basis for the car search was not stale" after "the passage of a few months" because documents evidencing a vehicle's ownership are "unlikely to be removed from a car at any point when the car is still in use"); *Rumph,* 754 F. Supp. 3d at 427–28 (reasoning similarly as to passage of three months).

The Court likewise concludes here that the passage of 55 days between the eluding offense and the warrantless search of the Nissan did not render the basis for

probable cause to search the vehicle for evidence of the identity of the driver at the time of the offense stale.  Contrary to Harris's argument, the Court considers it substantially more likely that items like insurance documents or fuel receipts would remain in the vehicle for a longer period of time than outwardly incriminating evidence like "physical proceeds or weapons" associated with a robbery or shooting.  (ECF No. 31 at 5.) Certainly, one would not expect that someone would remove the components comprising a vehicle's infotainment system over the course of 55 days.  (*See also* Tr. 74 (Officer Schoolmaster testifying he knows from "past investigations . . . that a vehicle infotainment system stores information for as long as the vehicle is operating").)

As a final point, Harris argues that, in urging the application of the automobile exception, "[t]he government asks this Court to create a new exception: that any traffic offense triggers indefinite authority to search a vehicle for identity evidence, even if officers already possess that evidence through registration records."  (ECF No. 31 at 5.) The Court here adopts no such bright-line rule.  To the contrary, it is wary of articulating any finding that may lend support to the notion that courts should reflexively permit law enforcement to conduct warrantless searches of vehicles anytime they are used in the commission of a traffic offense.

Nevertheless, based on the specific facts of *this* case, the Court finds that the officers had probable cause to search the Nissan for evidence related to the felony eluding offense.  As a result, the automobile exception permitted the officers'

14

warrantless search of the vehicle, and Harris's motion to suppress the evidence that was the product of that search fails on that basis.[3]

## IV.    CONCLUSION

For the foregoing reasons, Defendant Welton Harris III's Motion to Suppress Evidence (ECF No. 23) is DENIED.

Dated this 25th day of February, 2026.

BY THE COURT:

_____

William J. Martínez
Senior United States District Judge

---

[3] The Court notes that the Government separately addressed the seizure and search of the Nissan in its briefing. (ECF No. 29.) Since the Court has concluded the officers had probable cause to search the Nissan even before towing it to the police station, and the evidence Harris seeks to suppress is the fruit of that search, it sees little value to separately address whether the impoundment was justified by an exception to the warrant requirement. In any event, the Court would note that it understands even defense counsel to be of the view that the automobile exception, if satisfied, would have also permitted the officers to seize the Nissan. (Tr. at 8 (where defense counsel noted during the Hearing that "the standard automobile exception," if applicable, "does allow officers to seize a vehicle if there is probable cause that there's evidence of a crime")). Caselaw supports the same notion. *See United States v. Tapia,* 2010 WL 299245, at *5 (10th Cir. Jan. 27, 2010) ("The Supreme Court has repeatedly held that 'police officers with probable cause to search an automobile at the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant.'" (quoting *Texas v. White,* 423 U.S. 67, 68 (1975) (per curiam))); *Rountree v. Lopinto,* 976 F.3d 606, 609 (5th Cir. 2020) ("Under the automobile exception, [t]he police may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime." (internal citation and quotation marks omitted)); *United States v. Brookins,* 345 F.3d 231, 235 (4th Cir. 2003) ("Under the rule set forth in *Chambers,* officers with probable cause to search an automobile at the scene of an arrest or stop may constitutionally seize the automobile and subsequently search it at the station house without obtaining a warrant."); *United States v. Burton,* 288 F.3d 91, 100 (3d Cir. 2002) ("The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" (quoting *Labron,* 518 U.S. at 940)).